DECISION
Before this Court is a Sup. R. Civ. P. 56 motion for summary judgment brought by The Miriam Hospital ("Miriam"), Kathleen Hittner, M.D., and Harry Sax, M.D. (collectively, "Defendants"). They claim they are entitled to summary judgment as to Counts One through Seven because (1) they are entitled to immunity from liability under the Health Care Quality Improvement Act ("HCQIA or Act");[1] (2) the allegedly defamatory statements made by Dr. Sax were qualifiedly privileged and not a result of an improper motive; and (3) Plaintiff has not met his burden of proof under the Rhode Island Civil Rights Act ("RICRA").
 I Facts and Travel
Plaintiff is a Rhode Island licensed physician who has had clinical privileges at Miriam since October 1, 1984. While at Miriam, Plaintiff had a history of complaints from 1987 to 2002. Two particular complaints in 2002 escalated into disciplinary action by Miriam. On February 7, 2002, a complaint was made against Dr. Feller that he took inappropriate photographs of a patient following a colonoscopy procedure. Dr. Feller admitted the conduct, *Page 2 
explaining that it was discussed with the patient in advance and was to be done as a joke. (Pl. Aff. ¶ 7). As a result of this conduct, the Plaintiff's privileges at Miriam were immediately suspended, and an ad hoc committee convened to review the matter. (Defs. Ex. 25). The committee, which reported to the Miriam Executive Committee ("MEC") in accordance with Miriam Hospital Medical Staff Association Bylaws ("Miriam Bylaws"), recommended that Dr. Feller be suspended for two weeks and that "any future incidents regarding Dr. Feller's behavior will be subject to more stringent disciplinary actions." (Defs. Ex. 28). The MEC endorsed these recommendations and notified Dr. Feller on March 13, 2002.
Another complaint was filed against the Plaintiff on November 27, 2002, by a fellow Miriam physician for unprofessional conduct. This complaint resulted in a three month suspension of Dr. Feller's privileges by the MEC. However, pursuant to Miriam Bylaws, Dr. Feller requested an appeal of the pertinent MEC decision. On July 1, 2003, before the appeal hearing actually occurred, the parties entered into a Consent Agreement, [2] which obviated the need for such hearing. (Defs. Ex. 36; Pl. Ex. B). Pursuant to the Consent Agreement, Plaintiff agreed to a twenty-eight day suspension. In addition, Plaintiff and Miriam agreed that any future complaints against Dr. Feller would be reviewed by a panel consisting of three members: Dr. Kathleen Hittner, then President and Chief Executive Officer of Miriam; Dr. Boyd King, Senior Vice President of Medical Affairs for Lifespan Corp.; and Dr. James Myers, Miriam Hospital Staff Association member. The Consent Agreement provided that the panel was to make a *Page 3 
determination as to whether any new complaint requires termination of Dr. Feller's clinical privileges. Furthermore, Dr. Feller waived his right to an appeal of the panel's determination through any process outlined in the Miriam Bylaws, but retained his right to proceed in a court of appropriate jurisdiction.
In June of 2005, Dr. Harry Sax became Surgeon-in-Chief at Miriam. On May 17, 2007, Dr. Sax sent a complaint to Dr. Hittner concerning Dr. Feller's treatment of a patient as well as alleging that he backdated an entry in that patient's record. Acting pursuant to the Consent Agreement, the panel reviewed the complaint and conducted an investigation. The panel conducted an investigative interview of Dr. Feller, with counsel present, concerning Dr. Sax's complaint. On July 23, 2007, the panel informed Plaintiff that after consideration of the complaint and the history of complaints and disciplinary actions relating to him, it unanimously decided to terminate his privileges and association with Miriam. (Defs. Ex. 53). Plaintiff proceeded to file the instant action.
 II Standard of Review
Summary judgment is proper when, after reviewing the admissible evidence in the light most favorable to the non-moving party, "no genuine issue of material fact is evident from the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and the motion justice finds that the moving party is entitled to prevail as a matter of law."Smiler v. Napolitano, 911 A.2d 1035, 1038 (R.I. 2006) (quoting Rule 56(c)). When considering a motion for summary judgment, "the court may not pass on the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion."Lennon v. MacGregor, 423 A.2d 820, 822 (R.I. 1980). During a summary judgment proceeding, "the justice's only function is to determine *Page 4 
whether there are any issues involving material facts."Id. (quoting Steinberg v. State,427 A.2d 338, 340 (R.I. 1981)). "Therefore, summary judgment should enter `against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case * * *.'" Lavoie v. North East Knitting, Inc.,918 A.2d 225, 228 (R.I. 2007) (quotingCelotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (construing the substantially similar federal rule)).
 III Discussion A Immunity
In Count One of the complaint, Plaintiff alleges violation of G.L. 1956 § 23-17-23, which provides the board of trustees of a hospital or other appropriate body with the authority to suspend deny, revoke, or curtail the privileges of any staff member for good cause. In addition, it provides immunity for any hospital, hospital board of trustees, or any hospital medical staff committee that takes these actions in accordance with hospital bylaws. Section 23-17-23(b). In their motion for summary judgment, Defendants have asserted an affirmative defense of immunity under the HCQIA, the analogous federal statute. 42 U.S.C. § 11111 (2000). In opposition, Plaintiff contends that Defendants' failure to raise immunity from liability in their answer as an affirmative defense constitutes a waiver of this defense; and further, that Defendants' termination of the Plaintiff pursuant to the Consent Agreement was in bad faith and therefore failed to meet the criteria necessary for immunity.
As a preliminary matter, the Plaintiff argues that Defendants have waived an affirmative defense of immunity under the HCQIA pursuant to Sup. R. Civ. P. 8(c). Rule 8(c) does in pertinent part read "a party shall set forth affirmatively . . . any . . . matter constituting an avoidance or affirmative defense." Sup. R. Civ. P. 8(c). In support of his argument, Plaintiff *Page 5 
relies upon the holding in World-Wide Computer Resources, Inc v.Arthur Kaufman, that "the failure to raise an affirmative defense in a timely manner constitutes a waiver of that defense."615 A.2d 122, 124 (R.I. 1992). However, the rationale behind this holding is that the special pleading of an affirmative defense protects a party from unfair surprise at trial. Id. InWorldWide Computer Resources, the defendants had waived an affirmative defense by failing to raise it for the first time until during the trial even though the case had been pending for more than four years. Id. at 123. Here, the Defendants filed their motion for summary judgment on March 25, 2009, asserting that the HCQIA granted them immunity from Plaintiff's claims. Subsequently, Plaintiff filed his response on May 15, 2009, with the hearing on summary judgment in this case not until June 2, 2009. Consequently, Plaintiff was fairly advised of the Defendants' reliance on an immunity defense two months before the hearing on summary judgment and was therefore protected from any unfair prejudice. SeeHanley v. State, 837 A.2d 707, 710 (R.I. 2003) (plaintiffs received three months' notice of the state's specific reliance on immunity defense before the hearing on summary judgment motion and consequently did not waive the affirmative defense). After reviewing the record and mindful that the Rules of Civil Procedure should be liberally construed, the Court finds that the Defendants did not waive an immunity defense under the HCQIA.
A threshold issue then becomes the scope of immunity under the HCQIA and whether the Defendants qualify for such immunity under the Act. The HCQIA provides immunity to "the professional review body," "any person acting as a member or staff to the body," and "any person who participates with or assists the body with respect to that action." 42 U.S.C. § 11111(a) (2000). According to Plaintiff, Defendants are not entitled to immunity because the three-member review panel established by the Consent Agreement is not a professional review *Page 6 
body as defined by the HCQIA. 42 U.S.C. § 11151(11) (2000). However, the plain language of the Act defines a "professional review body" as "any committee of a health care entity which conducts professional review activity." Id. Under the HCQIA, professional review activity "means investigative process during/or upon which professional review action, i.e., decision, is made."Fobbs v. Holy Cross Health System Corp.,789 F. Supp. 1054 (E.D. Cal. 1992), F.3d 1439, cert. denied513 U.S. 1127 (1995).
The panel's decision to terminate Dr. Feller's privileges with Miriam was a "professional review action" by a "professional review body" within the meaning of the HCQIA. First, the Consent Agreement between the Miriam Hospital Staff Association and the Plaintiff established that a panel of three members — Dr. Kathleen Hittner, Dr. Boyd King, and Dr. James Myers ("panel or review panel") — would review any further complaints made against the Plaintiff. Additionally, the panel conducted an investigation concerning the complaint made by Dr. Sax against Dr. Feller. Finally, after such investigation, the panel unanimously determined to terminate Plaintiff's privileges and association with Miriam. Therefore, if the panel's actions meet HCQIA due process and fairness requirements, the panel and its members, including Dr. Hittner, shall be immune from damages liability.See 42 U.S.C. §§ 11111(a)(A), (B). Further, Miriam, a hospital as defined by the HCQIA, acquires immunity if it complies with the HCQIA criteria for conducting a peer review procedure.Tirado-Menendez v. Hospital Interamericano de Medicina,476 F. Supp. 2d 79, 82 (P.R. 2007). Moreover, Dr. Sax, a person who provided information to the panel, also enjoys immunity from money damages if the HCQIA standards are satisfied.See 42 U.S.C. §§ 11111(a)(1)(C); 11111(a)(2).
The Court now turns to the second issue: whether the review panel's determination concerning Dr. Feller qualifies for immunity under the HCQIA. The Act grants immunity from *Page 7 
damages liability for those engaged in a professional review action that satisfies the standards of the Act.See 42 U.S.C. § 11111(a)(1) (2000). Immunity under the HCQIA applies if a professional review action is taken:
 (1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). 42 U.S.C. § 11112(a) (2000).
Furthermore, the HCQIA includes a presumption that a professional review action meets the above quoted standard unless "rebutted by a preponderance of the evidence." Bakare v. Pinnacle Health,Inc., 469 F. Supp.2d 272, 287 (M.D. Pa. 2006). "In the context of a motion for summary judgment, this presumption means that `the plaintiff bears the burden of proving that the peer review process was not reasonable.'" Id. (quotingGordon v. Lewistown Hosp.,423 F.3d 184, 202 (3rd Cir. 2005) (emphasis added)). Thus, in analyzing this motion for summary judgment, the Court must analyze the review process under an objective standard, looking at the totality of circumstances. Id.; seeImperial v. Suburban Hosp. Ass'n, Inc.,37 F.3d 1026, 1030 (4th Cir. 1994).
 1 Reasonable Belief that the Action Was in the Furtherance of Quality Health Care
The first condition required for immunity under the HCQIA requires the review action be taken "in the reasonable belief that [such] action was in the furtherance of quality health care." 42 U.S.C. § 11112(a)(1) (2000). Plaintiff argues that Defendants have failed to meet the criteria for immunity because of allegations of actions made in bad faith. However, Plaintiff's argument of a violation of the requirement of good faith does not succeed under HCQIA case *Page 8 
law. Under the Act, the good or bad faith of the reviewers is an irrelevant consideration. Poliner v. Texas Health Systems,537 F.3d 368, 380 (5th Cir. 2008); see also,Mathews v. Lancaster Gen. Hosp.,87 F.3d 624, 635 (3rd Cir. 1996) (explaining that other circuits "have held that a defendant's subjective bad faith is irrelevant under § 11112(a) and have upheld a finding of immunity if, on the basis of the record, the court could conclude that the professional review action would further quality health care").
The undisputed evidence shows that Miriam instituted a peer review process after receiving a complaint from Dr. Sax concerning the quality of treatment given by Dr. Feller to a patient, as well as his documentation of that patient's consultation report. (Pl. Ex. G). In voting to terminate Dr. Feller's hospital privileges, the panel took into consideration information provided to it, as well as the history of complaints and disciplinary actions relating to Dr. Feller. (Defs. Ex. 53; Pl. Ex. K). Before the panel for consideration were several complaints. One of the complaints the panel considered, which had resulted in a two-week suspension, concerned Dr. Feller's taking photographs of a patient following a colonoscopy procedure. (Defs. Ex. 24-28). In addition, Dr. Feller's record included another complaint, which resulted in a three-month suspension of his privileges and the consequent formation of the Consent Agreement. (Defs. Ex. 32-35). In light of the long history of complaints and disciplinary actions concerning Dr. Feller, there is ample support that the panel reasonably believed terminating his privileges was in furtherance of quality heath care.
Plaintiff disputes the panel's decision, maintaining that Dr. Sax's complaint was groundless and the panel should not have considered any other information. However, the Consent Agreement, which designates the procedures for any future complaints received concerning Dr. Feller, in pertinent part reads: *Page 9 
 The panel shall review the complaint, obtain information from the complainant with respect to the complaint, obtain information from Dr. Feller with respect to the complaint, and obtain information from any other available and relevant source concerning the complaint. Following the gathering of such pertinent information, and taking into consideration the history of complaints and disciplinary actions relating to Dr. Feller up to that point in time, the panel shall make a determination as to whether or not the complaint requires termination of Dr. Feller's privileges and association with Miriam Hospital. (Defs. Ex. 36 ¶ 7; Pl. Ex. B ¶ 7) (emphasis added).
In signing the Consent Agreement, Dr. Feller consented to the consideration of complaints, such as the one submitted by Dr. Sax, as well as other complaints and disciplinary procedures already in his file. Furthermore, Plaintiff has not presented any specific evidence to show that the complaint is groundless and the review panel made an incorrect decision. Viewing the facts in the light most favorable to the Plaintiff, it was still not unreasonable for the panel to find that Dr. Sax's complaint concerning the consultation report necessitated the formation of a peer review panel, especially since this was not the first complaint concerning Dr. Feller and documentation of a patient's record. (Def. Ex. 38.) Moreover, even if Plaintiff could show that the panel ruled incorrectly regarding the complaint, he still would "not meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality." Imperial v.Suburban Hosp. Ass'n, Inc.,37 F.3d 1026, 1030 (4th Cir. 1994). For these reasons, the Court finds that Dr. Feller has failed to present any persuasive evidence that the professional review action taken by the panel, which terminated Dr. Feller's privileges and association with Miriam, was not taken in the "reasonable belief that the action was in the furtherance of quality health care." 42 U.S.C. § 11112(a)(1) (2000). Accordingly, Defendants have met the first standard necessary for immunity under § 11111(a).Id. *Page 10 
 2 Reasonable Effort To Obtain the Facts of the Matter
The second prong of the immunity standard requires a professional review action to be taken "after a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2) (2000). Plaintiff disputes that Defendants have properly satisfied this standard since the review panel did not allow him to confront Dr. Sax, to testify on his own behalf, or to present witnesses in his own defense. However, these arguments are unavailing because according to Miriam Bylaws "a disciplinary hearing need not be conducted according to the rules of law concerning examination of witnesses and presentation of evidence. Miriam Bylaws, Art. III § 1.12.2. Furthermore, although § 11112(b) describes certain rights afforded to a physician during a hearing, including the right to call and cross-examine witnesses, the panel review was not a hearing, but rather a peer review process conducted according to procedures agreed to by the Plaintiff in the Consent Agreement. (Defs. Ex. 36 ¶ 7; Pl. Ex. B ¶ 7). Moreover, the Act "specifically provides that failure of a review body to meet the enumerated conditions does not, per se, constitute a failure to meet the standards." Bryan v. James E. Holmes Reg'l Med. Ctr.,33 F.3d 1318, 1336 (11th Cir. 1994). The Plaintiff has failed to show that the procedures followed by the panel in obtaining and reviewing the relevant information, even though not of the precise nature outlined in § 11112(b), were not adequate.See id.
Furthermore, "[t]he relevant inquiry under § 11112(a)(2) is whether the totality of the process leading up to the Board's `professional review action' . . . evidenced reasonable effort to obtain the facts of the matter." In reviewing the complaint, this Court finds that the panel took many different steps to obtain information, including interviewing Dr. Feller, with counsel present, as well as Dr. Sax. The panel also considered the history of complaints and disciplinary actions against Dr. Feller. According to the Miriam Bylaws, the panel was entitled to consider *Page 11 
"any relevant matter upon which responsible persons acting in good faith customarily rely." Miriam Bylaws, Art. III § 1.12.2. Moreover, the panel properly obtained and reviewed the information required by the Consent Agreement. (Defs. Ex. 36 ¶ 7; Pl. Ex. B ¶ 7). Therefore, since Plaintiff has not presented sufficient evidence to suggest that the review panel's efforts to obtain the facts of the matter were not reasonable, this Court finds that the Defendants satisfied the second prong of the HCQIA. 42 U.S.C. § 11112(a)(2) (2000).
 3 Adequate Notice and Hearing Procedures
Satisfaction of the third prong of the Act requires termination of Plaintiff's privileges only "after adequate notice and hearing procedures . . . or after such other procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3) (2000). Plaintiff disputes that Defendants have met the standards because they failed to provide proper notice to Plaintiff regarding the details of the complaint and rejected Plaintiff's request for a hearing pursuant to the Miriam Bylaws. However, the Defendants counter that Plaintiff was properly notified about the review process and voluntarily waived his right to a hearing in the Consent Agreement.
Under the HCQIA, a health care entity is deemed to have met the adequate notice and hearing requirements of subsection (a)(3) if certain conditions are met or voluntarily waived by the physician. 42 U.S.C. § 11112(b) (2000). According to the statute, notice to the physician is proper if it states
 (A)(i) that a professional review action has been proposed to be taken against the physician, (ii) reasons for the proposed action, (B)(i) that the physician has the right to request a hearing on the proposed action, (ii) any time limit (of not less than 30 days) within which to request such a hearing, and (C) a summary of the rights in the hearing under paragraph (3). Id. at § 11112(b)(1). *Page 12 
It is Plaintiff's contention that he was not afforded proper notice because Defendants' letter did not provide him with information "concerning the precise nature of the complaint or any applicable by-law, regulation, code of conduct, code of ethics, statute, policy or procedure" that he violated. However, evidence submitted to the Court reveals that Plaintiff received a letter on June 25, 2007, referencing the complaint against him and the need to meet with the review panel. (Pl. Compl. ¶ 37). In addition, on July 2, 2007, Plaintiff received another letter from Defendants, through counsel, which provided a copy of the complaint submitted to the panel by Dr. Sax, a copy of the Consent Agreement outlining the review process, and a choice of two possible dates for Dr. Feller to meet with the review panel. (Pl. Ex. I). Plaintiff's argument that his notice was insufficient is mistaken because he received notification of the pending action and a copy of the complaint lodged against him. Moreover, there is nothing in the plain language of the statute that requires such detail as proposed by the Plaintiff.
It is true that Plaintiff's notice did not contain information concerning his right to request a hearing or a summary of rights for such a hearing. 42 U.S.C. § 11112(b)(1)(C)-(b)(3) (2000). In addition, Plaintiff asserts that Defendants deprived him of such a hearing as guaranteed by the Miriam Bylaws. However, "the plain language of § 11112(a)(3) indicates that a hearing is not the only way to fulfill this prong. It can also be met by the provision of `such other procedures as are fair to the physician under the circumstances provided.'" Wahi v. Charleston Area Med. Ctr.,453 F. Supp. 2d 942, 952 (S.D.W.Va., 2006) (quoting language from 42 U.S.C. § 11112(a)(3) (2000)).
In the instant matter, Plaintiff entered into the Consent Agreement with Miriam, which specifically outlined the procedures should any further complaints be lodged against him. Instead of the usual disciplinary procedures provided under the Miriam Bylaws, Plaintiff agreed *Page 13 
that the three-member panel would review any further complaints. (Defs. Ex. 36 ¶ 6; Pl. Ex. B ¶ 6.) The Consent Agreement explicitly provides that after reviewing the complaint and all pertinent information,
 the panel shall make a determination as to whether or not the complaint requires termination of Dr. Feller's privileges . . . Dr. Feller will have no right to an appeal of this decision, and by entering into this Agreement, so waives his right to appeal that decision through any internal process available to him through the Miriam Hospital Staff Association Bylaws. (Defs. Ex. 36 ¶ 7; Pl. Ex. B ¶ 7).
In addition, § 11112(b) expressly provides that compliance with its terms is not essential if the physician voluntarily waives them.Bryan, 33 F.3d at 1336 (11th Cir. 1994). Therefore, Plaintiff cannot argue that Defendants did not comply with the Miriam Bylaws or the procedures in § 11112(b) when he voluntarily waived those privileges by signing the Consent Agreement. Further, Plaintiff has not offered persuasive evidence that he was "not aware of the [review process], was otherwise prejudiced by its timing or scope, or denied an opportunity to be heard" by the panel. Reyes v. Wilson Mem'l Hosp.,102 F. Supp. 2d 798, 820 (S.D. Ohio 1998). Plaintiff is unsuccessful in rebutting the presumption that Defendants satisfied the notice and hearing standards. Consequently, this Court finds that the review panel took action against Plaintiff only after adequate notice and other procedures as were fair to the Plaintiff under the circumstances. 42 U.S.C. § 11112(a)(3) (2000).
 4 Reasonable Belief that the Action Was Warranted
The fourth and final prong of the immunity standard requires a professional review action to be taken "in the reasonable belief that the action was warranted by the facts." 42 U.S.C. § 11112(a)(4) (2000). Plaintiff maintains that the May 17, 2007, complaint was groundless, and *Page 14 
therefore, the panel's termination of his privileges was erroneous. In addition, Plaintiff further asserts that much of the material provided to the panel never should have been considered since it was decades old and never formed the basis for discipline under Miriam Bylaws. Defendants argue that based on Dr. Feller's history of complaints and disciplinary actions, combined with the complaint of Dr. Sax, there was a reasonable basis for the panel to terminate Plaintiff's privileges.
The evidence before this Court reveals the panel had factual support for its decision. Plaintiff has not disputed that he has a history of issues prior to the two complaints that led to the Consent Agreement. He also concedes that the two incidents leading to the Consent Agreement actually occurred and resulted in his suspension. His main argument regarding his history of complaints is that they relate to his interpersonal skills rather than his proficiency as a surgeon. In addition, Plaintiff argues that the complaint regarding the backdating of a patient's record, issued by Dr. Sax, is baseless because many physicians within the Lifespan network, of which Miriam is a member, do not date or sign consultation reports. Further, he insists that he did not backdate the patient's record.
Nevertheless, Plaintiff has not provided evidence that an interpretation of possible backdating by the panel was unreasonable. In fact, prior to the review of Dr. Sax's complaint, the panel reviewed another complaint against Dr. Feller involving his signature and poor documentation of a patient's record. (Def. Ex. 38). Further, Plaintiff has not addressed that the panel may also have chosen to review the complaint because of the treatment concerns also raised by Dr. Sax in the complaint. (Def. Ex. 52. ¶ 6). Even if Plaintiff could show that the panel's decision was incorrect and the complaint was unjustified, he still has not met his burden of contradicting the existence of a reasonable belief that termination was in furtherance of quality *Page 15 
health care and necessary under the circumstances. Brader v.Allegheny Gen. Hosp.,167 F.3d 832, 841 (3rd Cir. 1999) (quotingImperial, 37 F.3d at 1030). Moreover, the role of this Court "on review of such actions is not to substitute [its] judgment for that of the hospital's [review panel] or to reweigh the evidence regarding renewal or termination of medical staff privileges."Bryan, 33 F.3d at 1137 (11th Cir. 1994) (quoting Shahawy v. Harrison,875 F.2d 1529, 1533 (11th Cir. 1989)). Therefore, taking into account the complaint and information the panel received from Dr. Sax — as well as the long history of complaints and disciplinary actions concerning Dr. Feller including two previous suspensions — this Court finds that the Plaintiff did not rebut the presumption by a preponderance of the evidence, that the review panel's decision to terminate Dr. Feller was not made with "the reasonable belief that [such] action was warranted by the facts." 42 U.S.C. § 11112(a)(4) (2000).
In light of the preceding analysis, Plaintiff has failed to establish a genuine issue of material fact as to Defendants' satisfaction of the four requirements in § 11112(a). Accordingly, this Court must find that Defendants are entitled to immunity from damages liability pursuant to HCQIA § 11111(a). However, the Court must consider the scope of such immunity in regard to the multiple claims in this matter.
The HCQIA grants immunity "from all damages claims which arise out of the peer review process." Bakare, 469 F. Supp. 2d at 291;see 42 U.S.C. § 11111(a)(1). In addition, the Act includes within its definition of a professional review action all review activities "relating to" that action. Reyes,102 F. Supp. 2d at 821; 42 U.S.C. § 11151(9) (2000). Many of Plaintiff's claims arise out of the panel's review process and therefore are precluded by HCQIA immunity. Count One, which alleges violation of § 23-17-23 for termination of Dr. Feller's privileges pursuant to the review panel's decision, clearly arises out of the peer review process. *Page 16 
Counts Two and Three of the complaint allege tortious interference with business advantage against Defendants Sax and Hittner. These counts, which concern Dr. Sax's submission of the complaint and information to the panel, as well as Dr. Hittner's conduct concerning the complaint and notice of the review, are activities noticeably relating to the peer review process. In addition, Counts Four and Five allege that Defendants have breached the Consent Agreement. In view of the fact that the Consent Agreement concerns the very steps for conducting a peer review of Dr. Feller, these counts also receive immunity protection.
A notable exception to the HCQIA is that it does "not apply to damages under any law of the United States or any State relating to the civil rights of any person or persons." 42 U.S.C. § 11111(a)(D) (2000). Therefore, Defendants are not entitled to immunity under the HCQIA for Count Seven of Plaintiff's complaint, which alleges a violation of the Rhode Island Civil Rights Act for age discrimination. G.L. 1956 § 42-112-1. Additionally, the grant of immunity under HCQIA only applies to liability from damages and does not preclude private causes of action for injunctive relief. Imperial, 37 F.3d at 1030. However, Plaintiff has failed to raise any arguments or allege any facts that would warrant such relief. Therefore, this Court grants Defendants' motion for summary Judgment on Counts One through Five.
 B Defamation Claim
Furthermore, Count Six alleges that Dr. Sax defamed Dr. Feller, both orally and in writing. Plaintiff alleges Dr. Sax defamed him in the complaint letter as well as in information that he provided to the review panel. The complaint that Dr. Sax submitted to Dr. Hittner initiated the peer review process and remained a primary focus. Since these alleged defamatory communications concern writings or statements submitted to the panel, they are clearly related to the review process and included within the immunity protection of HCQIA. *Page 17 
In Count Six, Plaintiff also alleges that Dr. Sax made "defamatory statements orally with several physicians" that were similar to those found in the letter to Dr. Hittner requesting review of the care and documentation of Dr. Feller's patient. (Complaint ¶ 35). Whether the meaning of a particular communication is defamatory is a question of law for the court to decide rather than a factual issue for a jury to determine. Marcil v.Kells, 936 A.2d 208, 214 (R.I. 2007) (citing Alves v. HometownNewspapers, Inc., 857 A.2d 743, 750 (R.I. 2004)). For this Court, "the decisive question is what the person or persons to whom the communication was published reasonably understood as the meaning intended to be expressed." Id. (citing Restatement (Second)Torts § 563 cmt. e. at 164 (1977)). In addition, a plaintiff must show that the publication was defamatory on its face or by way of innuendo. Id. (citing Andoscia v. Coady,99 R.I. 731, 735, 210 A.2d 581, 584 (1965)).
In the instant matter, Plaintiff does not allege facts or provide evidence of who specifically heard the allegedly defamatory statement. Furthermore, to demonstrate the existence of an issue of material fact, the nonmoving party cannot rely solely on allegations in the pleadings. Heflin v. Koszela,774 A.2d 25, 29 (R.I. 2001). Here, Dr. Feller does not provide the details of the alleged statements or identify to whom they were actually made. This Court has ruled that statements that are too imprecise and vague cannot support a plaintiff's defamation claim because such a statement cannot be proven true or false.Leddy v. Narragansett Television, L.P.,843 A.2d 481, (R.I. 2004) Accordingly, without evidence describing the actual statements or identifying the recipients and their understanding of such statements, Plaintiff cannot support a claim of defamation, and this Court must grant summary judgment as to those allegations.
Furthermore, Plaintiff claims that Defendant Dr. Sax made defamatory statements to Dr. Crausman, who serves as Chief Administrator at the Rhode Island Board of Medical Licensure *Page 18 
and Discipline, as well as to the doctors present at a Miriam morbidity and mortality conference ("M M") concerning the death of the patient whose care is the subject of the complaint. According to the Plaintiff, when contacted by the Board of Medical Licensure and Discipline concerning the revocation of Dr. Feller's privileges, Dr. Sax told Dr. Crausman that the revocation was not only because of a documentation issue but also because of the treatment of the patient. (Pl. Depo. 29:10-11). In addition, Plaintiff claims that during the M M, Dr. Sax "did indicate that [Dr. Feller] should have dated [his] signature on the consultation report in the patient's chart" and that "during this conference, he intimated, in front of all physicians present, that [Dr. Feller] deliberately declined to place a date on the consultation report." (Pl. Aff. ¶ 22). Defendants argue that Dr. Sax had a qualified privilege to make these alleged defamatory statements. The statement made by Dr. Sax that Dr. Feller should have dated his signature is not defamatory on its face and does not support a claim for defamation.Marcil, 936 A.2d at 214. However, this Court will now address the alleged defamatory nature of the other alleged statements.
The publisher of an allegedly defamatory statement may avoid liability if he or she is privileged to make the statement in question. Mills v. C.H.I.L.D., Inc.,837 A.2d 714, 720 (R.I. 2003) (citing Swanson v. SpeidelCorp., 110 R.I. 335, 339-40, 293 A.2d 307, 310 (1972)). A qualified privilege can exist "if the publisher makes the statements in good faith and `reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third person[s], or certain interests of the public.'" Id. (quotingPonticelli v. Mine Safety Appliance Co.,104 R.I. 549, 551, 247 A.2d 303, 305-306 (1968)). It is well established that the scope of the privilege includes communications between persons who have a common interest in a particular subject matter. Ponticelli, 104 R.I. at 552, *Page 19 247 A.2d at 306. When responding to questions by Dr. Crausman, Defendant enjoyed a qualified privilege to make the statements because a "reciprocity of duty" existed between both doctors.Ponticelli, 104 R.I. at 551, 247 A.2d at 306. Here, Dr. Crausman, as Chief Administrator at the Rhode Island Board of Medical Licensure and Discipline, had an interest in knowing the circumstances concerning the termination of Dr. Feller's privileges at Miriam. In addition, Dr. Sax, as a Rhode Island licensed physician, had a duty to respond to the inquiry by Dr. Crausman and the Board of Medical Licensure and Discipline and inform them of his knowledge and opinions concerning the event.
Furthermore, the purpose of an M M is to discuss adverse medical events and errors with the goal of improving patient care. Edgar Pierluissi, M.D. et al., Discussion of Medical Errors inMorbidity and Mortality Conferences, 290 The Journal of the American Medical Association, 2838, 2838 (2003). The doctors attending an M M have common goals such as education, quality health care, and self-improvement and "[c]onstructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit." Weekoty v. U.S.,30 F. Supp. 2d 1343 (D.N.M. 1998) (quoting Bredice v. DoctorsHospital, Inc., 50 F.R.D. 249, 251 (D.D.C. 1970)); seealso U.S. v. Harris Methodist Fort Worth,970 F.2d 94, 101 (5th Cir. 1992) (recognizing an overwhelming public interest in promoting improvement in health care through the mechanism of physician peer review). Therefore, Dr. Sax's statements in regard to the treatment and documentation of Dr. Feller's patient at the M M are privileged.
However, this privilege is not absolute and certainly must not be abused. Swanson, 110 R.I. at 340, 293 A.2d at 310 (citingPonticelli, 104 R.I. at 551, 247 A.2d at 305-306)). Plaintiff contends that Defendant Sax's lack of good faith negates any claim of a qualified privilege. *Page 20 
With regard to the scope of a privilege, "a privileged communication is, by definition, made in good faith." Mills,837 A.2d at 720. Furthermore, once privilege is established, the plaintiff has the burden of proving that the publisher made the statements with an improper motive. Boston Mut. Life Ins. Co. v.Varone, 303 F.2d 155 (1st Cir. 1962). To support this burden, the plaintiff must prove that the "primary motivating force for the communication was the publisher's ill will or spite."Mills, 837 A.2d at 720 (citing Ponticelli,104 R.I. at 551, 556, 247 A.2d at 305-06, 308). However, "where the causative factor was the common interest, a publisher's resentment toward the person defamed is immaterial and any incidental gratification is without legal significance." Avilla v. NewportGrand Jai Alai, LLC, 935 A.2d 91, 96 (R.I. 2007) (quotingSwanson, 110 R.I. at 341, 293 A.2d at 311).
To meet his burden, Plaintiff alleges that Dr. Sax was motivated by either the desire to take over Dr. Feller's patient revenues or was discriminating against him because of his age, or both. However, the evidence in the record reveals that Dr. Sax did not seek out Dr. Crausman, but rather responded to an inquiry by Dr. Crausman and the Board of Medical Licensure and Discipline concerning the facts relevant to Dr. Feller's termination. See Boston Mut. LifeIns. Co., 330 F.2d at 155 (finding that even if the defendant was pleased to see the plaintiff in further difficulties, this was not the cause of the defendant's letter, which was written in response to the Commissioner's inquiry, and was no more than duly responsive). Additionally, in regard to Dr. Feller, Dr. Sax has presented evidence that his primary concern was patient care and the work environment. (Sax Depo. II. 23:2-5). Furthermore, even prior to the M M in question, Dr. Sax had concerns over Dr. Feller's documentation and counseled him privately regarding it. (Sax Depo. I. 78:14-20). It is well-settled in Rhode Island that whether an improper motive was the incentive for a publication is ordinarily a question for the fact finder unless the only reasonable *Page 21 
conclusion that can be reached from the facts alleged is that the ill will or spite were merely incidental rather than motivating.Swanson, 110 R.I. at 341, 293 A.2d at 311. In the context of these investigations concerning the quality of health care and patient treatment, Plaintiff has failed to show that the primary motivating factor for Dr. Sax's communications was ill will or spite. Therefore, this Court finds that Plaintiff has failed to raise a genuine issue of fact concerning improper motive on the part of Dr. Sax, and therefore, the Defendants' motion for summary judgment must be granted.
 C Civil Rights Claim
Under this theory of liability, Plaintiff asserts that all Defendants have wrongfully, intentionally, and impermissibly interfered with Dr. Feller's property rights and his rights to make and perform contractual relationships based partly and wholly on his age of 62 in violation of the Rhode Island Civil Rights Acts. Section 42-112-1. Defendants maintain that Plaintiff has failed to produce any evidence that he was terminated based on his age rather than legitimate nondiscriminatory reasons.
A threshold question is whether Dr. Feller, likely an independent contractor of Miriam, is entitled to protection under RICRA. Under the Federal Age Discrimination in Employment Act ("ADEA"), an individual has a cause of action only if he is an employee, not an independent contractor, at the time of his termination.Garrett v. Phillips Mills, Inc.,721 F.2d 979, 980 (4th Cir. 1983). However, the Rhode Island Supreme Court has held that RICRA applies to all forms of discrimination in the workplace. Bard v. Mark Stevens CVS,Inc., 378 F. Supp. 2d 33, 39 (D.R.I. 2005) (citing Ward v.City of Pawtucket Police Dep't, 639 A.2d 1379, 1381 (R.I. 1994)). The clear language of RICRA protects "all persons within the state" from discrimination based *Page 22 
on age. Section 42-112-1(a). Further, it is well-settled under Rhode Island law that RICRA and the Fair Employment Practices Act ("FEPA") should be read in relation to each other and consistent with their common objective to prevent discrimination. Horn v. S. UnionCo., 927 A.2d 292, 294 (R.I. 2007). FEPA does not limit itself to "employers" as defined by the ADEA, but rather, it explicitly reaches "any person, whether or not an employer." 29 U.S.C. § 630(b) (2000); G.L 1956 § 28-5-7(6);see Wyss v. General Dynamics Corp.,24 F. Supp. 2d 202, 210 (D.R.I. 1998). Therefore, even as an independent contractor rather than an employee of Miriam, Plaintiff has standing under RICRA.
Turning now to the issue of age discrimination, this Court notes the legal analyses under RICRA and FEPA are identical to that of a federal cause of action under the ADEA. 29 U.S.C. §§ 621-634 (2000); Antonucci v. Life Care Ctrs. ofAmerica, Inc., No. 06-108ML, 2008 WL 417675 (D.R.I. 2008) (citingBard, 378 F. Supp. 2d at 40 (D.R.I. 2005)). Consequently, Rhode Island has applied the federal legal framework to provide structure to analogous state discrimination statutes. Neri v.Ross-Simons, Inc., 897 A.2d 42, 48 (R. I. 2006) (citingNewport Shipyard, Inc. v. Rhode Island Comm'n for HumanRights, 484 A.2d 893, 897-98 (R.I. 1984)) A disparate treatment theory of discrimination is available under the ADEA when an "employer simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics.]" Hazen Paper Co. v. Biggins,507 U.S. 604 (1993). In employment discrimination cases alleging disparate treatment, the courts follow the burden-shifting framework established in McDonnell Douglas Corp. v. Green,411 U.S. 792, 802 (1973); see also Reeves v. SandersonPlumbing Products, Inc., 530 U.S. 133, 141 (2000). The Rhode Island Supreme Court adopted the McDonnell Douglas
burden-shifting framework in Ctr. for Behavioral Health v.Barros, 710 A.2d 680 (R.I. 1998). Under this framework, plaintiff bears the *Page 23 
initial burden of establishing a prima facie case. McDonnellDouglas, 411 U.S. at 802. In an action for age discrimination, a prima facie case requires a demonstration that "(1) the plaintiff was over the age of forty, (2) his work was sufficient to meet his employer's legitimate expectations, (3) his employer took adverse action against him, and (4) the employer had a continuing need for the services provided by the position from which the claimant was discharged." Neri, 897 A.2d at 49 (quoting RamírezRodríguez v. Boehringer Ingelheim Pharmaceuticals, Inc.,425 F.3d 67, 78 n. 11 (1st Cir. 2005)); cf. Casey v. Town ofPortsmouth, 861 A.2d 1032, 1037 (R.I. 2004) (stating the prima facie case in a failure to hire age discrimination case)). Plaintiff's proper prima facie case gives rise to an inference that the employer discriminated due to the plaintiff's advanced age.Id.; Freeman v. Package Machinery Co.,865 F.2d 1331, 1335 (1st Cir. 1988). However, to ultimately succeed on an age discrimination disparate treatment claim, a plaintiff must still prove, "by a preponderance of the evidence, that age was the `but for' cause of the challenged adverse employment action." Gross v. FBL Financial Services, Inc.,129 S.Ct. 2343 (2009).
In the instant matter, Plaintiff has established his prima facie case. First, at the time of the adverse employment action, Plaintiff was 61 years old and consequently a member of a protected class.See G.L. 1956 § 28-5-6. Second, Plaintiff was qualified for his position at Miriam as a Board Certified General Surgeon with attending physician privileges at Miriam and Roger Williams Hospital for over twenty years. Third, Plaintiff also experienced adverse employment action when the three-member review panel unanimously decided to terminate his privileges at Miriam in accordance with the Consent Agreement. Finally, Plaintiff has shown that Dr. Vithiananthan, who has similar qualifications and performed similar surgeries and roles at Miriam, replaced Dr. Feller as an on-call doctor for ER General Surgery. (Pl. Ex. M). *Page 24 
The next step requires the Defendants to rebut the Plaintiff's prima facie case with a legitimate, nondiscriminatory reason for the termination of privileges. St. Mary's Honor Ctr. v. Hicks,509 U.S. 502 (1993); see Casey v. Town of Portsmouth,861 A.2d 1032, 1037 (R.I. 2004). In this second step of theMcDonnell Douglas framework, Defendants have only a burden of production rather than persuasion. Casey, 861 A2d at 1037. Defendants have offered evidence that Plaintiff's termination was a result of a peer review process which reviewed a complaint alleging improper care and poor documentation of patient records. According to the Defendants, the cause of Dr. Feller's termination was not only the single complaint presented by Dr. Sax but also its combination with a long history of complaints and disciplinary actions, including two suspensions. Therefore, Defendants have presented a legitimate, nondiscriminatory reason for terminating Plaintiff's privileges at Miriam.
The third and final prong of the McDonnell Douglas analysis requires Plaintiff to prove that Defendants' legitimate, nondiscriminatory reason for terminating his privileges was merely a pretext for unlawful animus. Casey, 861 A.2d at 1038. The allegations of age discrimination by Plaintiff focus on the alleged actions and comments of Dr. Sax. In his affidavit, Plaintiff alleges that Dr. Sax was pressuring him to retire, stating that he was too old to maintain his current level of practice. (Pl. Aff. ¶ 14). Even assuming that these statements are true, they are not indicative of pretext since the panel, the actual decision maker in the adverse action, did not make them. Hill v. Lockheed Martin LogisticsManagement, Inc., 354 F.3d 277 (4th Cir. 2004). Plaintiff may argue that discrimination still exists because Dr. Sax not only submitted the complaint that initiated the peer review process but also supplied information to the review panel. However, such an argument would fail because Dr. Sax was not responsible for actually determining whether Dr. Feller's privileges would be terminated. See e.g., Hill v. Lockheed MartinLogistics *Page 25 Mgmt., Inc., 354 F.3d 277 (4th Cir. 2004); (finding no support for imposing liability on the employer when the safety inspector, who allegedly harbored discriminatory animus towards older workers, was not the actual decision maker or person principally responsible for terminating the employee); seealso Ferrand v. Credit Lyonnais, 110 Fed. Appx. 160, 2004 WL 2029988 (2nd Cir. 2004) (holding that anti-female comments made by employee's immediate supervisor did not demonstrate a pretext for gender discrimination since superior was not the decision maker with respect to certain adverse employment actions). In order to prevail on the third prong of the McDonnell Douglas analysis, a plaintiff must prove that the prohibited reason was a determinative factor in employer's termination decision. Jones v. United Parcel Service, Inc.,461 F.3d 982 (8th Cir. 2006). Moreover, FEPA, which is read in relation to RICRA, as well as the ADEA, prohibit discrimination "because of" and individual's age. G.L. 1956 § 28-5-7; G.L. 1956 § 42-112-1(a); 29 U.S.C. § 623(a)(1) (2000);Gross, 129 S. Ct. at 2350 (2009). However, in the immediate matter, despite Dr. Sax's initial reporting of the complaint to Dr. Hittner for review by the panel, it was only the review panel that investigated the complaint and ultimately unanimously decided to terminate Plaintiff's privileges. Plaintiff has not provided evidence that anyone other than Dr. Sax, and more importantly that anyone on the review panel, exhibited animus towards him related to his age.
Summary judgment is proper under the third prong of theMcDonnell Douglas framework when no reasonable jury could infer discrimination from the totality of the evidence presented including the plaintiff's prima facie case. Casey,861 A.2d at 1039 (citing Waterhouse v. District of Columbia,298 F.3d 989, 992-93 (D.C. Cir. 2002)). Plaintiff has provided evidence to support a prima facie case that his superior, Dr. Sax, discriminated against him because of his advanced age. However, it is undisputed that the review panel, and not Dr. Sax, made the decision to *Page 26 
terminate Plaintiff's privileges at Miriam. In light of the totality of facts, this Court cannot find evidence to support an inference that the adverse action was a result of intentional discrimination against the Plaintiff on account of his age. Therefore, Plaintiff has not met his burden under the third prong of the McDonnellDouglas framework, and this Court must grant Defendants' motion for summary judgment.
 VI Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court finds that the Defendants, having satisfied the standards as set forth in the HCQIA, are immune from damages liability. Additionally, Dr. Sax's letter and communications to the panel are related to the review process and included within the immunity protection of HCQIA. Furthermore, Dr. Sax's communications to Dr. Crausman and during the M M are qualifiedly privileged, and Plaintiff has failed to show that the primary motivating factor for these communications was ill will or spite. Moreover, since Plaintiff has not met his burden under the third prong of the McDonnellDouglas framework, he has not established a prima facie case for age discrimination under RICRA. Therefore, this Court hereby grants Defendants' motion for summary judgment as to all claims.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] 42 U.S.C. § 11111 (2000).
[2] Plaintiff asserts that since the Miriam Hospital Board of Trustees neither authorized nor ratified the Consent Agreement, it is not valid and binding. However, authorization to enter into such an agreement is outlined in Art. IV § 4.0 of the Miriam Bylaws. Section 4.0(d) expressly provides
 [n]otwithstanding any of the hearing, review, and disciplinary procedures outlined in Article IV of the Miriam Bylaws, section 4.0 expressly provides that "any applicant/staff member may at any time reach an agreement under this Article with the Executive Committee, and all further proceedings under this Article shall cease upon conclusion of such agreement.